IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL COULTON : CIVIL ACTION
:
v. :
:
UNIVERSITY OF PENNSYLVANIA : NO. 05-1446

### MEMORANDUM

**Padova, J.** **March 21, 2006**

Plaintiff Michael Coulton has brought this action against the Trustees of the University of Pennsylvania alleging reverse racial discrimination under 42 U.S.C. § 1981 and the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq*. Before the Court is Defendant's Motion for Summary Judgment. (Doc. No. 13.) A Hearing on the Motion was held on March 15, 2006. For the reasons which follow, Defendant's Motion is granted.

I.     BACKGROUND

The following facts are undisputed. (Def. Statement Undisputed Facts; Pl. Resp. to Def. Statement Undisputed Facts.) Plaintiff, a Caucasian male, is a certified laboratory animal technician who began work for the University in 1998 as an animal caretaker. (Coulton Dep. at 13-26.) After holding various positions with different University departments, Plaintiff accepted a job in the University Laboratory Animal Research department ("ULAR") in September 2003 as the lead laboratory animal technologist. (Id. at 92-94.) The decision to hire Plaintiff was made by three African American supervisors. (Id. at 95-97.) Plaintiff claims that when he started in the ULAR department, one of the supervisors, Tom Henry (an African American), informed him that ninety percent of the ULAR staff was African American and Plaintiff should expect to be called racial terms

1

by some of the staff.  (Id. at 116, 127; Henry Dep. at 17-19.)  However, Plaintiff cannot recall any member of the ULAR staff ever actually calling him by a racial term.  (Coulton Dep. at 127.)

Plaintiffs' job responsibilities meant that he was occasionally the acting supervisor on duty. (Campbell Dep. at 13.)  Plaintiff had difficulty with some staff members defying his directions. (Coulton Dep. at 113-115.)  Two African American caretakers told him that the problems he was experiencing were "because [he] was white."  (Id. at 116-19.)  Plaintiff discussed the problems with his supervisor Celestine Campbell (an African American), and she intervened on his behalf and told the staff to do as he instructed.  (Id. at 141.)

On September 7, 2004, Campbell returned from a lunch with several employees from the ULAR facility where Plaintiff worked.  (Campbell Dep. at 24.)  The employees discussed the fact that a garbage disposal was broken, and Campbell jokingly blamed Donta Williams (an African American), a temporary cage wash worker.  (Id.)  Williams replied that he was not responsible, but that Plaintiff might have broken the garbage disposal when he dropped laboratory mice into it.  (Id. at 26-27.)  Campbell asked Williams if he was joking and he replied that he was not.  (Id. at 27.) Campbell called Williams into her office and questioned him.  (Id.)  Williams informed Campbell that he had seen Plaintiff drop live mice down the garbage disposal in the cage wash area on several occasions and that the most recent incident occurred approximately two weeks previously.  (Id. at 32.)  Williams completed an incident report that included his written statement.  (Id. at 35-36.)

Campbell recognized that Plaintiff's alleged behavior violated the University's policy regarding the humane treatment of animals, which stated that the use of carbon dioxide gas and injectables was the only acceptable means of euthanizing animals at the University.  (Def. Ex. A, Coulton-6.)  Plaintiff had received training on the proper methods of euthanasia when he joined the

2

University in 1998 and again in 2003.  (Coulton Dep. at 49-50, 99-100.)  After her meeting with

Williams, Campbell telephoned the Associate Director of the ULAR department, Derrick Dow (an

African American), and reported the allegations to him.  (Campbell Dep. at 35.)  Dow contacted the

University's Human Resource Department and spoke with Susan Curran (a Caucasian), the Human

Resource Director for Provost Administrative Affairs and the person responsible for personnel issues

within the ULAR department.  (Curran Dep. at 9, 12, 20; Dow Dep. at 30.)  Dow and Curran decided

that an investigation into the allegations against Plaintiff would be necessary and agreed that they

should perform the investigation jointly.  (Curran Dep. at 21; Dow Dep. at 30-31.)

Dow and Curran first met with Williams on September 15, 2004 to determine the veracity

of his allegations.  (Curran Dep. at 22, 30; Dow Dep. at 31-32.)  Williams explained that on three

separate occasions he had seen Plaintiff walk into the cage wash area holding a live mouse and, after

calling "Hey Donta," drop the mouse into the garbage disposal.  (Curran Dep. at 25-26; Dow Dep.

at 32-33.)  Williams stated that he and Plaintiff were the only people in the cage wash room at those

times, since the other employees assigned to the room were on break.  (Curran Dep. at 25; Dow Dep.

at 32-33.)  When asked why he had not reported those incidents earlier, Williams explained that

because Plaintiff was his supervisor, he had assumed Plaintiff's actions were proper and did not

question them.  (Curran Dep. at 27; Dow Dep. at 33-34.)  Williams also indicated that he had always

gotten along well with Plaintiff.  (Curran Dep. at 24.)  After meeting with Williams, Dow checked

the euthanasia request forms for the day of the most recent alleged incident to determine whether any

mice were scheduled to be euthanized.  He found euthanasia request forms for that date, though none

filled out by Plaintiff.  No mice were reported unaccounted for on that day.  (Dow Dep. at 38-39.)

Dow and Curran met with Plaintiff on September 16, 2004.  (Def. Ex. O.)  In response to

3

questioning, Plaintiff stated that he got along fine with the staff at his facility, though he had recently had problems with Warner Days. (Coulton Dep. at 144-46; Dow Dep. at 40-41.) He affirmed that he knew the proper euthanasia procedures and that the approved method involved carbon dioxide. (Coulton Dep. at 144; Curran Dep. at 33; Dow Dep. at 40.) Dow and Curran then told Plaintiff that an employee had made allegations that Plaintiff improperly euthanized rodents. Plaintiff testified that he was "shocked" by the accusations, but he does not recall whether he specifically denied them. (Coulton Dep. at 146.) Dow has said that he also does not recollect whether Plaintiff denied the allegations, but he remembers that Plaintiff changed the subject and began "rambling on about other things." (Dow Dep. at 42.) Curran's stated memory is that the Plaintiff said "no" and went on talking about a different subject without asking any questions regarding the specifics of the allegations. (Curran Dep. at 44.) Dow and Curran both testified that they thought it was strange that Plaintiff did not vehemently deny the allegations or ask questions regarding who made them. (Id.; Dow Dep. at 69.) Dow and Curran asked Plaintiff if he had any idea why someone would make up these kinds of allegations against him, and Plaintiff identified Warner Days as a person who might make up allegations because of previous conflicts between them. (Curran Dep. at 34; Dow Dep. at 41.) He also discussed having problems with his subordinates because he was the only white employee in his facility of the ULAR. (Curran Dep. at 34.) At the conclusion of the interview, Dow and Curran informed Plaintiff that he was going to be placed on administrative leave pending the completion of the investigation and handed him a letter explaining the terms of his administrative leave. (Coulton Dep. at 154; Def. Ex. A, Coulton-20.) They then met with Campbell, who reiterated the circumstances through which she heard the allegations against Plaintiff. (Curran Dep. at 45-47; Dow Dep. at 45-46.)

Both Dow and Curran credited Williams' allegations and concluded that Plaintiff had improperly euthanized rodents. (Curran Dep. at 44; Dow Dep. at 68-69.) On October 4, 2004, after consulting with his own supervisor, Dr. Diane Gaertner (a Caucasian), Director of ULAR, Dow met with Plaintiff and informed him that he was being terminated. (Coulton Dep. at 173; Dow Dep. at 68.) Dow handed Plaintiff a letter stating that based on the investigation, the University had determined that Plaintiff had engaged in the improper euthanasia of rodents by placing them into the garbage disposal unit. (Def. Ex. A, Coulton-21.) Dow remembers Plaintiff saying, "You know me, and I wouldn't do this." (Dow Dep. at 79.) Dow subsequently sent a report to Dr. Alan Rosenquist, Chair of the University's Institutional Animal Care and Use Committee (IACUC), who had been following the investigation. (Def. Ex. I.) The letter stated that the investigation was complete and that the alleged perpetrator had been terminated. (Id.) The University's Vice Provost for Research, Dr. Perry Molinoff, then wrote to the federal Office of Laboratory Animal Welfare (OLAW), a division of the National Institute of Health that has supervisory powers over institutions receiving federal funds for research, advising that the University had received and investigated an allegation that a University employee had improperly euthanized mice, that the employee had been terminated, and that ULAR, in cooperation with IACUC, would continue to train ULAR staff on the proper procedures for the euthanasia of animals. (Def. Ex. J.) OLAW responded that it was satisfied that appropriate actions had been taken to investigate, correct, and prevent the recurrence of inhumane treatment of laboratory animals. (Def. Ex. K.)

Plaintiff filed an internal grievance following his termination. (Coulton Dep. at 179; Def. Ex. A, Coulton-24.) He complained that his termination was unjustified because the allegations

against him were false and it was discriminatory because it was based on his race.[1]  (Def. Ex. A,

Coulton-24.)  In accordance with University policy, Plaintiff's internal grievance was placed on hold

while his claims of discrimination were investigated.  (Def. Ex. A, Coulton-27.)  The Director of the

University's Affirmative Action Office charged investigator Patrice Miller with looking into

Plaintiff's claims.  Miller found no merit to Plaintiff's allegations of discrimination and sent a letter

to him and to Dow's supervisor, Dr. Gaertner, summarizing her findings.  (Def. Ex. A, Coulton-33;

Def. Ex. O-P.)

      In January 2005, a University panel heard Plaintiff's grievance over his termination.  (Def.

Ex. Q.)  In accordance with University policy, the panel was chosen by Plaintiff and the ULAR

department and consisted of three faculty and staff members from the University.  (Id.)  The panel

listened to testimony from Williams, Dow, Plaintiff, and Plaintiff's character witnesses.  (Coulton

Dep. at 196-98, 209; Dow Dep. at 70-71.)  The panel unanimously agreed with Miller's conclusion

that there was no evidence of discrimination against Plaintiff, but it also believed that the decision

to terminate Plaintiff was not based on a thorough investigation and was "not supported by the

evidence in light of the glowing reports we heard from veterinarians and other staff concerning

[Plaintiff's] high standards and caring attitudes toward the animals."  (Panel Findings and

Recommendations, Pl. Ex. P.)  The panel elaborated:

> "What this case truly boils down to is questionable information
> passed along from a 9 month, untrained temporary employee in
> animal care [Williams] versus a seasoned University employee in a
> supervisory role.  From this information a long-term promoted
> employee was terminated based on one person's report.  The evidence
> did not produce any dates, times, or reasoning.  We find the evidence

---

[1]Plaintiff also alleged the termination was discriminatory because it was based on his age.
Plaintiff is no longer pursuing his age discrimination claim.

to be unclear and not sufficient to terminate an employee of Michael Coulton's experience, stature, reputed character and years of training. Furthermore, we feel strongly that ULAR management and HR did not include the direct manager [Campbell] in the termination process and should have.  In closing, we feel that Michael Coulton should be reinstated in his position with back pay."

(Id.)  The grievance panel's recommendations were not final, as the ultimate decision to accept or reject them had to be made by the University's President or her designee.  (Def. Ex. N.)

Plaintiff's grievance proceeded to Joann Mitchell (an African American), Vice President and Chief of Staff and the University President's designee for resolving grievances.  Mitchell received from Curran the documentation relating to Plaintiff's grievance, including an executive summary, the grievance panel's recommendations, the materials submitted by Plaintiff and ULAR at the grievance hearing, Williams' witness statement, and a letter from Miller summarizing the results of her investigation of Plaintiff's claims of discrimination.  (Mitchell Dep. at 31-32.)  Mitchell reviewed the documents and interviewed Curran and each member of the grievance panel.  (Id. at 33.)  Mitchell then made the decision to reject the grievance panel's recommendation of reinstatement and uphold Plaintiff's termination.  (Id. at 52.)

II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial responsibility of "identifying those portions of [the record] . . . which it believes demonstrate an absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The movant must then establish that it is entitled to

judgment as a matter of law on the basis of the undisputed facts.  See Fed. R. Civ. P. 56(c).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).  "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "material" if it may affect the outcome of the matter pursuant to the underlying law.  Id.  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

III.   DISCUSSION

Plaintiff argues that Defendant's decision to fire him was reverse racial discrimination in violation of § 1981 and the PHRA.  Section 1981 and PHRA claims are "addressed collectively as the same standards and analysis are applicable to each."  Roberts v. GHS-Osteopathic Inc.-Parkview Hosp., Civ. A. No. 96-5197, 1997 WL 338868, at *5 (E.D. Pa. June 19, 1997) (citing cases).  The Court applies the burden-shifting analysis developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) to claims of reverse discrimination.  Iadimarco v. Runyon, 190 F.3d 151, 158 (3d Cir. 1999).  Under this analysis, the plaintiff must first establish a prima facie case of discrimination, which merely requires that the plaintiff "present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based on a trait that is protected under Title VII [of the Civil Rights Act of 1964]."  Id. at 161.  "The evidentiary burden at this stage is rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent – i.e., that discrimination *could* be a reason for the employer's action."  Marzano v. Computer Science Corp., 91 F.3d 497, 508 (3d Cir. 1996) (emphasis in original).  Once

the plaintiff makes this showing, the burden shifts to the employer to articulate some "'legitimate, non-discriminatory reason'" for its adverse action. Iadimarco, 190 F.3d at 157 (quoting McDonnell Douglas, 411 U.S. at 802). If the employer offers some evidence of a legitimate, non-discriminatory reason, to defeat summary judgment the plaintiff must then show that the stated reason was in fact pretext by pointing to "'some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" Id. at 166 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).

A.    Plaintiff's Prima Facie Case of Race Discrimination

Plaintiff maintains that he has established a prima facie case of discrimination. According to Plaintiff, the fact that the initial action to discharge him was taken by the African American associate director of a predominantly black department and upheld by an African American University Vice President supports the inference that the decision was motivated by impermissible considerations of race. Plaintiff relies on Henry's statement during his hiring that he could expect the ULAR staff's perception of him to be shaped by issues of race, and the comments by two ULAR staff members that Plaintiff's difficulties as a supervisor were because of his race, in order to assert that the ULAR department was a racially charged environment. Plaintiff also cites to a statement Henry made during his deposition: that the allegations against Plaintiff were "so ridiculous . . . that it [race] had to have something to do with it." (Henry Dep. at 33.) Plaintiff finally supports his contention that Defendant treated him less favorably because of his race by identifying an African American employee who he claims was similarly situated to him – the employee faced an allegation of inhumane animal treatment two years before Plaintiff – but who was reinstated by the University

9

President's designee at that time.  In August 2002, Campbell witnessed three African American ULAR employees, Warner Days, James Griffin, and Michael Sanders, holding gerbils captive in a box filled with bleach.  (Def. Ex. T-3.)  The University terminated Griffin and Days.  (Id.)  At Days' grievance panel hearing, another employee, Marie Casner, who had left the room before Campbell arrived, stated that Days had placed the box with the gerbils on the table and Griffin had been the one to spray them with bleach.  (Def. Ex. T-8.)  The grievance panel found that there was not sufficient evidence to uphold Days' termination and recommended that he be reinstated.  (Def. Ex. T-6.)  Unlike in Plaintiff's case, the University President's designee, then Clifford Stanley, abided by the panel's recommendation and reinstated Days.  (Def. Ex. T-9.)

        The Court finds that Plaintiff has not established a prima facie case of race discrimination. That Plaintiff was initially discharged by Dow and finally terminated by Mitchell, both African American, does not give rise to an inference of discrimination.  The United States Court of Appeals for the Third Circuit has held that, although the race of the individuals responsible for an adverse employment decision "is certainly relevant, it is insufficient to establish a prima facie case of discrimination without more."  Iadimarco, 190 F.3d at 156; see also Mosca v. Cole, 384 F. Supp. 2d 757, 765 (D. N.J. 2005).  The remarks by Henry and ULAR staff members that Plaintiff, as a Caucasian male, could anticipate and in fact was having problems supervising a predominantly African American staff, and Henry's later conclusion that the allegations against Plaintiff must have had something to do with race are inadequate to maintain a discrimination claim, for neither Henry nor the ULAR staff members made any decisions related to Plaintiff's termination.  The Third Circuit has noted that while "stray remarks" by non decision-makers or by decision-makers unrelated to the decision-making process "may be properly used by litigants as circumstantial evidence of

discrimination," Walden v. Georgia-Pacific Corp., 126 F.3d 506, 521 (3d Cir. 1997), such remarks "'are rarely given great weight, particularly if they were made temporally remote from the date of decision.'" Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 359 (3d Cir. 1999) (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992)).  Courts consider those remarks primarily for evidence of the atmosphere in which an adverse employment decision was made, but the comments on record address the attitudes of Plaintiff's subordinates and are not suggestive of the University's managerial culture. Walden, 126 F.3d at 521; Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 333 (3d Cir. 1995).  Indeed, Henry specifically said during his deposition that though he believed that racial animus may have motivated Williams' allegations, he had no evidence that the University administrators who terminated Plaintiff were affected by considerations of race. (Henry Dep. at 32, 39-41.)  Furthermore, several of the administrators who supported Plaintiff's termination, specifically Curran and Dr. Gaertner, were Caucasian. Cf. Turgeon v. Marriott Hotel Servs, Inc., Civ. A. No. 99-4401, 2000 WL 1887532, at *8 (E.D. Pa. Dec. 27, 2000) (noting that where the person who made the final decision to terminate a plaintiff was the same race as the plaintiff, that fact undercuts the plaintiff's ability to establish a prima facie case of discrimination).  Plaintiff's contention that his termination reflected discriminatory intent is additionally undermined by the fact that the only person appointed to a position as a Laboratory Animal Technologist since his termination is a Caucasian male.[2] (Def. Ex. R at 6.) But cf. Pivirotto,

---

[2]Though the inquiry is not whether Defendant discriminated against Caucasians in general, but whether Defendant illegally discriminated against Plaintiff, Iadimarco, 190 F.3d at 165, a fact finder could look at Defendant's employment decisions within the ULAR department and conclude that Defendant treated Plaintiff in a non-discriminatory fashion.  At the time of Plaintiff's termination, there were at least twenty-three Caucasian employees in the ULAR department. (Def. Ex. S.)  Plaintiff is the only Caucasian employee within ULAR to file an internal or external complaint of race discrimination during the last five years.  (Def. Ex. R at 8.)  No Caucasian

191 F.3d at 357 (rejecting requirement that plaintiff must prove replacement by someone outside of protected class).

The University's decision to reinstate Plaintiff's claimed comparator, Warner Days, is not evidence that Plaintiff was treated less favorably than a similarly situated African American employee because the circumstances surrounding the decision to reinstate Days are distinguishable from the circumstances in which the University denied reinstatement to Plaintiff. In order to be similarly situated, Plaintiff and Days must "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment for it." Turgeon, 2000 WL 1887532, at *8 (quoting Bullock v. Children's Hosp. of Phila., 71 F. Supp. 2d 482, 489 (E.D. Pa. 1999)). In Days' case, there were exonerating eye-witness statements and the need to remedy procedural errors committed by the University in handling his grievance; in Plaintiff's case, those mitigating factors were absent. (Def. Ex. T-6.) Two employees in addition to Days – Sanders and Griffin – were implicated in the August 2002 alleged incident of animal cruelty. During Days' grievance hearing, Sanders submitted a written statement saying that Days had "nothing to do with [the] incident on the day in August 2002 about the gerbils spraying." (Def. Ex. T-7.) Another employee who had been present during the incident, Casner, submitted a signed letter saying that Griffin was the wrongdoer. (Def. Ex. T-8.) By contrast, at Plaintiff's grievance hearing, Plaintiff was the only alleged perpetrator and Williams, the sole eye witness,

---

employee has ever filed a complaint of race discrimination against any of the decision-makers involved in this case, including Dow and Mitchell. (Mitchell Dep. at 15; Def. Ex. R at 8.) Since Dow became the Associate Director of ULAR in March 2004, six employees have been terminated for cause. (Def. Ex. T, Curran Decl. at ¶5.) Of those employees, four are African American (including Williams, who was apparently terminated for reasons unrelated to the incident involving Plaintiff), one is Caucasian (Plaintiff), and one employee's race is unknown. (Id. at ¶ 6-8.)

affirmed that Plaintiff had improperly euthanized animals.  (Coulton Dep. at 209.)   Another difference between Days' case and Plaintiff's case is that the ULAR department violated the University's timeliness procedures when processing Days' grievance.  (Def. Ex. T-6.)  Days' grievance panel informed the President's designee that such a violation was reason to reinstate Days, and the designee agreed with the panel's recommendation.  (Def. Ex. T-6, T-9.)  Plaintiff's grievance hearing, however, did not entail violations of University procedure.[3]  (Pl. Ex. P.)  To the extent the August 2002 incident is comparable to Plaintiff's incident, it shows that the University is willing to terminate African American and not just Caucasian employees for alleged animal cruelty, for the University discharged Griffin (an African American) in response to the August 2002 allegations and did not reinstate him.  (Def. Ex. T-3.)  Accordingly, the Court concludes that Plaintiff has not made out a prima facie case of race discrimination.

    B.    <u>Defendant's Articulated Nondiscriminatory Rationale</u>

Even assuming, arguendo, that Plaintiff has established a prima facie case of discrimination, Defendant has articulated legitimate nondiscriminatory reasons for Plaintiff's termination.  <u>See</u>

---

[3]Moreover, the Court notes that Plaintiff and Days are not similarly situated because different University President's designees were involved in making the decision whether or not to reinstate them; Mitchell handled Plaintiff's case and Stanley handled Days' case.  "[W]hen employment decisions concerning different employees are made by different supervisors, such decisions are seldom sufficiently comparable to raise an inference of discrimination because different supervisors may exercise their discretion differently."  <u>Taylor v. Procter & Gamble Dover Wipes</u>, 184 F. Supp. 2d 402, 410 (D. Del. 2002), <u>aff'd</u>, 53 Fed. Appx. 649 (3d Cir. 2002) (citing <u>Maull v. Div. of State Police</u>, 141 F. Supp. 2d 463, 483 (D. Del.2001)).  Plaintiff argues that because the decisions in Plaintiff's and Days' cases were made pursuant to the same institutional grievance procedure and concerned the application of the same University policies and practices, they cannot be distinguished based on the identity of the particular administrators involved.  Courts, however, have distinguished a plaintiff from his claimed comparators based on the presence of different decision-makers even in cases where the employment decisions at issue were made through institutional mechanisms.  <u>See</u> <u>Taylor v. Div. of State Police</u>, No. Civ. 03-252-SLR, 2004 WL 1368847 (D. Del. June 15, 2004), <u>aff'd</u>, 122 Fed. Appx. 598 (3d Cir. 2005).

Creely v. Genesis Health Ventures, Inc., Civ. A. No. 04-0697, 2005 WL 1271876, at *5 (E.D. Pa. May 26, 2005) (citing Fuentes, 32 F.3d at 763).  The decision-makers directly responsible for Plaintiff's termination, Dow and Mitchell, have testified that Plaintiff was initially discharged because of the belief that Plaintiff improperly euthanized animals and that Plaintiff was not reinstated because there was reason to discount the grievance panel's recommendation.  Dow stated that he credited the allegations against Plaintiff because Plaintiff admitted that he did not have any problems with Williams, Williams had no reason to make up the allegations, and Plaintiff did not satisfactorily address the allegations during his interviews.  (Dow Dep. at 69.)  Mitchell heard conflicting assessments of Williams' credibility from Curran and the grievance panel members. (Mitchell Dep. at 41-50.)  Curran told Mitchell that she was persuaded that Williams was telling the truth; the panel members indicated they thought that Williams may have been lying.  (Id. at 41, 46.) Mitchell testified that she opted not to adopt the conclusions of the grievance panel, in part because she disagreed with the logic of the panel that a temporary employee was not as credible as a long term employee.  (Id. at 53-55.)  Mitchell also testified that she thought she was in the possession of more information than the grievance panel; she had heard from Curran that the investigation had been brought before IACUC and might be reported to the federal government, and she did not believe the grievance panel had been similarly notified.  (Id. at 39, 55.)  Mitchell explained that if the grievance panelists had known the incident was considered so serious they might have decided, as she did, against reinstating Plaintiff.  (Id. at 55.)

      C.    Pretext

       When a defendant answers a plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to "some evidence from which a factfinder could

reasonably conclude that the defendant's proffered reasons were fabricated (pretextual)," and therefore a ruse for discrimination.  Fuentes, 32 F.3d at 764.  Plaintiff contends that Defendant's reasons for terminating him are clearly pretextual, as no rational decision-maker could have legitimately credited the accusations of Williams over the denials of Plaintiff.  Accordingly to Plaintiff, Williams' claim, that he did not immediately report Plaintiff when Plaintiff dropped live mice into the garbage disposal because he did not know such obviously repulsive behavior was wrong, is implausible, especially since Williams had been trained on proper euthanasia procedures.[4] Moreover, Williams was less credible than Plaintiff since he was only a nine-month temporary worker whereas Plaintiff was a long-term, professionally trained employee with supervisory duties. Plaintiff maintains that the grievance panel's conclusion that Williams was "lying" was the only justifiable one, and that truism, combined with the fact that Mitchell decided to uphold the results of an investigation that the grievance panel determined was not thorough, would allow a jury to conclude that Defendant's proffered reasons for terminating plaintiff were post hoc fabrications. (Mitchell Dep. at 46.)

    The Court finds that Plaintiff is not entitled to an inference of discrimination because the University believed the allegations against him.  The Third Circuit instructs that "pretext is not shown by evidence that 'the employer's decision was wrong or mistaken, since the factual dispute

---

[4]Defendant contests that Williams was trained in proper methods of euthanasia.  A training log reviewed by Dow did not list Williams as a trained employee, and Campbell, Williams' supervisor, testified that Williams had not received training.  (Dow Dep. at 51-52; Campbell Dep. at 21-22.)  However, in deciding a summary judgment motion, the Court is required to draw inferences from the record in a light most favorable to the non-moving party, and Henry testified that Williams had been trained.  (Henry Dep. at 57.)   Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare, 402 F.3d 374, 379 (3d Cir. 2005) (citing Fed. R. Civ. P. 56(e)).

at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'"   Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (quoting Fuentes, 32 F.3d at 765).  See also Keller v. Orix Credit Alliance, 130 F.3d 1101, 1109 (3d Cir. 1997) (en banc) ("'The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination.'" (quoting Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir.1996)).  Plaintiff's attempts to undermine the allegations against him by highlighting reasons to disbelieve them do not make it more probable that the University acted with discriminatory motive.

Plaintiff further asserts that Mitchell's asserted justification for rejecting the grievance panel's recommendation - that she was aware the allegations against Plaintiff might be escalated to IACUC and the federal government while the panel was not – is inconsistent with her acknowledgment that IACUC is automatically notified any time there is an allegation of improper euthanasia, whether or not the allegation is true.  (Mitchell Dep. at 56; Rosenquist Dep. at 10-13.) Thus, Defendant contends, the "new" information Mitchell said she possessed about IACUC's awareness of the investigation into the accusations against Plaintiff was not new at all, but something she could have assumed, and was therefore put forth as a pretext for discrimination.  Plaintiff also emphasizes the oddity and rareness of a grievance panel recommendation being rejected by the President's designee; Henry and Mitchell testified that they had been directly involved in ten other and three other grievance panel hearings, respectively, and in not one of those other situations did the University reject the panel's recommendation.  (Henry Dep. at 61-62; Mitchell Dep. at 28.)

The Court finds that Plaintiff has not demonstrated "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for

16

its action that a reasonable factfinder could rationally find them unworthy of credence.'" <u>Kautz</u>, 412 F.3d at 467 (quoting <u>Fuentes</u>, 32 F.3d at 765).  Defendant has consistently explained that the University received a report that Plaintiff treated animals inhumanely, it investigated the allegations, it credited the allegations over Plaintiff's denial and, based on its conclusions regarding the allegations, it terminated Plaintiff's employment.  Mitchell's statement that she believed the grievance panel was unaware that IACUC had been alerted to the allegations against Plaintiff stands uncontradicted; the fact that such escalation was standard procedure does not bear on her perception of the information available to the grievance panel.  Moreover, the fact that Mitchell, as permitted by University policy, exercised her discretion in disregarding the grievance panel's recommendation does not constitute evidence that her articulated reason for terminating Plaintiff was "'so plainly wrong that it cannot have been the employer's real reason.'" <u>Jones v. School District of Phila.</u>, 198 F.3d 403, 413 (3d Cir. 1999) (quoting <u>Keller</u>, 130 F.3d at 1109); <u>cf.</u> <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 259 (1981) (noting that anti-discrimination statutes were not intended to "diminish traditional management prerogatives").  Consequently, the Court holds that Plaintiff's evidence of pretext does not cast sufficient doubt upon Defendant's proffered reasons for terminating Plaintiff to create a genuine issue of material fact.  The Court, therefore, grants Defendant's Motion for Summary Judgment with respect to Plaintiff's claims of reverse racial discrimination under § 1981 and the PHRA.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL COULTON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF PENNSYLVANIA | : | NO. 05-1446 |

**O R D E R**

**AND NOW**, this 21st day of March, 2006, upon consideration of Defendant's Motion for Summary Judgment (Doc. No. 13), Plaintiff's response thereto, and the Hearing held on March 15, 2006, **IT IS HEREBY ORDERED** that said Motion is **GRANTED**.  **JUDGMENT** is hereby entered in favor of Defendant and against Plaintiff.

BY THE COURT:

_____ /s/ John R. Padova
John R. Padova, J.